IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 28, 2022

**STATE OF TENNESSEE v. ELIJAH BOWMAN**

**Appeal from the Criminal Court for Knox County**
**No. 114447   G. Scott Green, Judge**

_____

**No. E2021-00614-CCA-R3-CD**

_____

The Defendant-Appellant, Elijah Bowman, was convicted by a jury of first-degree felony murder, two counts of attempted second degree murder, two counts of especially aggravated robbery, and aggravated assault. He received a total effective sentence of life imprisonment plus twelve years. The sole issue presented on appeal is whether the evidence is sufficient to support his convictions of first-degree felony murder, attempted second degree murder, and especially aggravated robbery. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JILL BARTEE AYERS and JOHN W. CAMPBELL, SR., JJ., joined.

Mitchell T. Harper, Knoxville, Tennessee, for the Appellant, Elijah Bowman.

Herbert H. Slatery III, Attorney General and Reporter; Hannah-Catherine Lackey, Assistant Attorney General; Charme P. Allen, District Attorney General; and Hector Sanchez and Larry Dillon, Assistant District Attorneys General, for the Appellee, State of Tennessee.

**OPINION**

The facts giving rise to the instant case stem from a 2018 robbery and shooting, which resulted in the death of Denise Stevens and serious bodily injury to Deauntray Woods and Hunain Abdul-Rasheed. Around 9:30 p.m. on January 28, 2018, the Defendant and four of his friends-D.J. Wright, Amir Spears, Don Davis, and Christian Rader Jones-arrived at Stevens's home to purchase marijuana from Woods. Soon after arriving, the Defendant, Wright, and Spears began shooting, killing Stevens and injuring Woods and Rasheed. The Defendant took marijuana, an AR-15 rifle, and a backpack containing $25,000 from the home as he fled the scene with his friends.

On December 5, 2018, the Knox County Grand Jury returned an indictment charging the Defendant and co-defendant Amir Hassan Spears with alternative counts of first-degree felony murder in the perpetration of a robbery of Stevens (count one) and first-degree premeditated murder of Stevens (count two); attempted first-degree murder of Rasheed (count three); attempted first-degree murder of Woods (count four); especially aggravated robbery of Stevens (count five), especially aggravated robbery of Rasheed (count six), and especially aggravated robbery of Woods (count seven).

The Defendant was tried jointly with co-defendant Spears, and the trial spanned from December 2 to December 5, 2019. Woods testified that he arrived at the home of Stevens, his cousin, around 11:00 a.m. on January 28, 2018. He and his friend, Rasheed, "chilled, smoked, and relaxed all day." Woods confirmed that he had been selling marijuana out of Stevens's home every day for the past year. Around 3:00 p.m., Woods received a Snapchat message from the Defendant, who wanted to purchase marijuana. Woods knew the Defendant because they had "gr[own] up together." They arranged for the Defendant to purchase "a half ton" of marijuana for a thousand dollars at Stevens's home later that day. The Defendant messaged Woods around 8:00 or 9:00 p.m. that he was ready to meet, and Woods gave the Defendant Stevens's address. Woods testified that the Defendant, accompanied by Wright, arrived at around 9:30 p.m. When the Defendant arrived, Woods and Rasheed were in the living room, Stevens was in her bedroom, and Stevens's three children were asleep in two other bedrooms in the house. After Rasheed let the Defendant and Wright into the house, the Defendant greeted Woods. The Defendant shook Woods's hand, gave him a hug, and asked how Woods had been doing. Woods responded that he was good and had the marijuana on the coffee table. There was also an AR-15 rifle that belonged to Stevens and a backpack containing $25,000 that belonged to Woods on the couch.

Woods testified, "not even [] five seconds after [the Defendant had greeted him]," Stevens came to the doorway of the living room looking nervous and worried. She asked, "Who is this walking up my driveway with this big ass rifle?" Woods testified that there was a window in Stevens's room overlooking the driveway. Woods stated that Rasheed, Wright, and the Defendant all had "blank looks" on their faces, "like we didn't know what was going on." Rasheed opened the front door, and co-defendant Spears was standing there with an AR-15 rifle aimed at Rasheed's chest. co-defendant Spears pointed the rifle at Rasheed's head and "that's when the first shot [went] off." Woods then stated, "Rasheed kind of backs up when the first shot goes off and it misses him, and he turns and runs towards [Stevens's] bedroom, closing himself and Stevens inside the bedroom." He said that as Rasheed was running, co-defendant Spears was "aiming down the barrel shooting rounds at [Rasheed]." The Defendant then pulled out a gun and shot Woods from no more than "two feet away." Woods testified that he and the Defendant made eye contact when

the Defendant shot him. Wright then took out a revolver and shot Woods, knocking him to the ground. The Defendant, co-defendant Spears, and Wright turned and starting shooting through Stevens's closed bedroom door. When the gunshots ceased, Woods saw the Defendant and Wright grab the marijuana from the coffee table along with the backpack and AR-15 rifle from the couch as they ran out of the house.

Once the Defendant, co-defendant Spears, and Wright were gone, Woods got up and tried to open Stevens's bedroom door. He said he could only partially open it because Stevens was lying on the floor in front of the door, mumbling in pain. He also saw Rasheed crawling on the floor, who had been shot and "[could not] move." Woods squeezed through the door and checked on their injuries. He then went to the other bedrooms in the house to check on the three children, who were asleep when the shooting started.

Woods testified he sustained two gunshot wounds-one to his right shoulder above the clavicle and one to his groin, "straight through [his] penis." He stated that the injury to his groin was the most severe, caused "extreme physical pain," and required surgery because his penis had been "split like a banana." He stated that it took six weeks to completely recover from this injury and that he had a catheter for three or four weeks. He also testified that his shoulder injury healed in about two weeks but that, at the time of trial, the muscles in his arm were still affected and prevented him from doing a lot of heavy lifting. The day after the shooting, Woods identified the Defendant from a photo array as one of the shooters. The signed identification form was admitted into evidence. Woods also identified the Defendant in court.

On cross-examination, Woods clarified that Rasheed was not involved in selling marijuana. When asked if anyone said anything to him after the shooting started, he said, "no, never, give me the money, never nothing." He also stated that there were two rounds of shooting that occurred over approximately eight minutes. During the first round of shooting, he said co-defendant Spears fired about "four shots" at Rasheed as he was running toward the bedroom door. Woods was then shot by the Defendant and Wright. Woods said, "I don't even know how many times [co-defendant Spears] fired the second time, I just know I [saw] everybody shooting at the door . . . at the second point of shooting." He stated that he had never met co-defendant Spears or Wright prior to that night.

Hunain-Abdul Rasheed testified that he was living at Stevens's home on the night of the shooting and had been friends with Woods since high school. He had planned to go out and smoke with some friends on the night of the shooting but Woods had asked him to stay until Woods had finished the sale of marijuana to the Defendant. When the Defendant arrived at Stevens's home, Rasheed let him and Wright into the house. He testified that he had never met the Defendant but that he knew Wright from an after-school program. He

confirmed the testimony of Woods, noting that shortly after the Defendant and Wright arrived, Stevens emerged asking, "Why is one of your friends running up here with a gun?" This prompted Rasheed to open the front door only to find a man with a gun pointed at his face. When the man shot at Rasheed, Rasheed turned and ran toward Stevens's bedroom. Rasheed pushed Stevens to the ground, closed the door behind him, and stood frozen as he heard gunshots.

Rasheed said that Stevens got up and tried to open the door during a break in the gunfire. As she did so, Stevens was hit by a bullet that came through the door, which caused her to slide down the wall to the ground. When Rasheed tried to help Stevens, he was also shot. The bullet struck Rasheed in "the top part of [his] butt[,]" caused his legs to go "numb," and he fell to the ground. When the shooting stopped, Rasheed crawled out of the bathroom, got up, and limped into the living room to help the others. Rasheed's cell phone was used by Woods to call 911, the recording of which had been admitted previously into evidence and played for the jury in court.

Rasheed was unable to identify the man at the door, and he had never met co-defendant Spears prior to the shooting. The day after the shooting, Rasheed identified the Defendant from a photo array as one of the shooters, and the signed identification form was admitted into evidence. Rasheed was shot in his left leg, which caused a permanent limp. He said that his leg now gives out when he exercises or "jump[s] too much." He also said that his lower back is "tore up," that he wakes up in pain, and that he gets a "twitch" in his back. He explained that the bullet was never removed from his body because his doctors said it would have caused more damage to take it out.

On cross-examination, Rasheed said that Stevens had received the AR-15 rifle as a gift from a friend "for protection." He said the rifle would typically be kept in Stevens's room but that Woods had gotten the gun out for the "transaction" with the Defendant.

Don Davis testified that he was at his house with the Defendant, Wright, and Jones on January 28, 2018. At some point, the four of them left in Jones's car to pick up co-defendant Spears. The men then drove to Stevens's home for the Defendant to buy marijuana from Woods. It was dark when they arrived at Stevens's home. Jones parked his car down the hill in front of Stevens's house, and the Defendant and Wright got out, walked up to the house, and knocked on the front door. Davis explained they were supposed to watch the Defendant and Wright to "make sure [they were] safe." Davis and co-defendant Spears then got out of the car, walked to the house, and left Jones in the driver's seat of the car. As Davis and co-defendant Spears walked to the back side of the house, they heard a gunshot and ran back to the car. Although Davis said co-defendant Spears "stayed back," Davis was unsure whether co-defendant Spears proceeded to the front door. Davis confirmed that everyone at his house had a firearm; however, he was

unsure of the specific type of firearm the Defendant or Wright had that night. Davis first became aware that co-defendant Spears was armed when co-defendant Spears pulled an AR-15 rifle out of his pants.

Davis returned to the car, and he and Jones waited for everyone else. When the Defendant, co-defendant Spears, and Wright came back to the car, the Defendant handed Davis an AR-15 rifle. Davis confirmed that the Defendant did not have the rifle when he went into the house, and he opined the rifle came from inside Stevens's home. They returned to Davis's house, "split up" the stolen half a pound of marijuana, and Davis received about two ounces. The AR-15 rifle taken from Stevens's home was left at Davis's house until Wright retrieved it the next day.

Davis testified that he had an informal immunity agreement with the State, which provided he would not be charged for his involvement in the case in exchange for his cooperation and truthful testimony. Davis admitted that he was not truthful in his initial interview with Investigator Charlie Lee because he "didn't want to have nothing to do with nothing." On cross-examination, Davis agreed that he initially told Investigator Lee that (1) he did not know what had happened on the night of the shooting because he was intoxicated at his house and had passed out in the car on the way to Stevens's house; and (2) that he woke up after hearing gunshots right before everyone got back in the car.

Christian Rader Jones testified that on the day of the shooting, he called the Defendant, whom he knew from high school, to get some marijuana. He met the Defendant at his cousin Davis's house. Jones said the Defendant, Davis, and Wright were at the house when he arrived, and the Defendant eventually contacted Woods to buy marijuana. Jones drove the Defendant, Wright, and Davis to pick up co-defendant Spears, and they proceeded to Stevens's house. Jones testified that he was unaware that anyone was armed and that the Defendant directed him to back into Stevens's driveway and park. The Defendant and Wright then got out of the car and walked toward the house. Jones said that they were "ten feet from the house [when] they looked back and waved at the car" to signal co-defendant Spears and Davis to come up after them. Jones explained that the Defendant and Wright were already in the house as co-defendant Spears and Davis were walking up to the front porch. He said that he remained in the car the entire time.

As co-defendant Spears approached the house, Jones saw him remove a rifle from his pants. He then heard "roughly four to six" gunshots. Soon after, everyone ran from the house and back to the car. He said that everyone had firearms when they returned to the car. Co-defendant Spears had a "rifle looking weapon," Wright had a "black pistol," Davis had an "AR from the house which [Wright] handed to him as they were leaving the [house]," and the Defendant had a silver revolver. Jones clarified that Davis did not approach the house with a weapon. The Defendant told Jones to drive and Davis directed

him to take them back to Davis's house. While driving back, Wright said that "he believed he shot someone in their stomach." The Defendant said "f[—]k with me, you know, I'll f[—]k around and get rich." Once they returned to Davis's house, everyone went inside and began dividing the marijuana. Jones stated that he did not take any of the marijuana and left. When asked if he had an agreement with the State, Jones stated that he was promised immunity conditioned upon his truthful testimony at trial.

On cross-examination, Jones testified that no one in the car talked about robbing anyone on the way to Stevens's house. He also did not see anyone with a gun prior to the shooting. Jones said he had no reason to suspect "anything out of the ordinary" as he waited for his friends to return to the car.

Officer Rachel Britt of the Knoxville Police Department (KPD) testified that she was on patrol the night of the shooting and responded to a 911 call at Stevens's home. She and two other officers arrived on the scene and entered the home to conduct a protective sweep. She observed two male victims in the living room and eventually discovered three children in a back bedroom. Officer Britt also observed a door with bullet holes in it and attempted to open it; but it was blocked by what appeared to be a body. Officer Britt ultimately found Stevens unresponsive and lying face down on the floor in front of the door. She testified that Stevens was not breathing and appeared to have gunshot wounds to her upper torso and one of her arms. Stevens was moved away from the door, turned over, and administered first aid.

KPD violent crimes Investigator Jason Booker stated that the Defendant was identified as a suspect thirty-four hours after the offense. Investigator Booker prepared a search warrant for the Defendant's home and went to the Defendant's home along with SWAT officers to execute the warrant. The SWAT team knocked on the Defendant's door and the Defendant answered. The Defendant was then taken into custody based on an arrest warrant. Investigator Booker accompanied Officer Jacklyn Walkup on a walkthrough of the home, during which she took numerous photographs. The photos taken by Officer Walkup were admitted into evidence and depicted a handgun, an AR-15 rifle, magazines for both firearms, spent shell casings, a bullet, and various documents identifying the Defendant. Investigator Booker said all of these items were found in a bedroom in the Defendant's home.

KPD Officer Jacklyn Walkup, a crime scene and latent print investigator, testified that she was called to the scene of the instant shooting to document and collect evidence. Upon arrival, she extensively photographed the interior of the house. She also collected six nine-millimeter shell casings from the scene. Of the six casings, five were "PMC cartridge casings" and one was a "Winchester nine-millimeter cartridge casing." The five PMC casings were found "in the living room walking back towards the hallway and into

- 6 -

the back bedroom." The Winchester casing was found in the back bedroom. She also recovered four copper jacket bullets and one fragment of a copper jacket bullet. The photographs, shell casings, and bullet fragments collected from the scene were admitted into evidence.

Officer Walkup testified that she also documented via photography a search warrant executed at the Defendant's home. In addition to taking photographs, Officer Walkup recovered two firearms that were admitted into evidence. The first firearm was a "Taurus 709 slim nine-millimeter handgun" found under a mattress at the Defendant's home. The first firearm had a package containing "two Winchester nine[-]millimeter cartridges, one PMC nine[-]millimeter cartridge[,] and two FC nine[-]millimeter Hollow Point cartridges." When asked which types of nine-millimeter shell casings were recovered from the crime scene, she replied, "five PMC nine-millimeter cartridge casings and one Winchester nine[-]millimeter cartridge casing." The second firearm recovered from the Defendant's home was an AR-15 found "underneath a bed against a wall." While conducting her search, Officer Walkup also documented several pieces of evidence identifying the Defendant, including a community college ID badge, a W-2 form for a check made out to the Defendant, and a bank statement for the Defendant. These were all found in the same bedroom where the firearms were recovered. Photographs of these documents were admitted into evidence at trial.

When asked if she was able to lift any fingerprints in this case, Officer Walkup stated that she lifted a fingerprint from the magazine of the Taurus nine-millimeter handgun recovered from the Defendant's home. Officer Walkup also testified that, while she did not conduct a fingerprint examination of the print, she "verif[ied] a finding of fingerprints" made by the main print examiner in the case. Her identification of the print matched the one made by the main print examiner, which concluded the print lifted from the handgun belonged to the Defendant.

KPD Officer Edward Johnson, a certified latent print examiner of the forensic unit, was accepted as an expert in the field of latent print identification. When asked how a fingerprint was generally acquired and analyzed, Officer Johnson explained that prints were recovered from items of evidence by various methods, such as fingerprint powder or super glue processing, and then entered into the Automated Fingerprint Identification System (AFIS) that would search that print against known prints and produce a list of potential candidates. He said a visual comparison then takes place between the latent print and those produced by the AFIS to identify the print.

Officer Johnson testified that he examined a latent print taken from the magazine of a nine-millimeter Taurus handgun recovered from the Defendant' home. He stated that he analyzed the print and entered it into AFIS. From there, he received a list of about "10 or

15" candidates to compare to the print. Based on his visual comparison, he identified the print lifted from the handgun as a match to the Defendant. He stated that his identification was later verified by Officer Walkup.

On cross-examination, Officer Johnson clarified that, once he receives a list of potential candidates, he compares them side-by-side using his judgment and expertise to determine if there is a match. When asked about the verification process, he explained that a second examiner would conduct a second independent analysis using the same process used to make the initial identification. If the second examiner reaches a different conclusion than the initial examiner, it is not verified and there is no identification. The report containing Officer Johnson's conclusions was admitted into evidence.

Sergeant Brian Dalton, a supervisor over the KPD forensic unit, was declared an expert in the field of forensic firearms and tool mark examination. Sergeant Dalton testified that he was called to supervise and assist Officer Walkup on the night of the shooting. He stated that he assisted in the recovery of six nine-millimeter cartridge cases and five bullets or bullet fragments from the scene. He conducted a forensic analysis on four out of the five bullets and the six shell casings. Sergeant Dalton's final report on his examination of the firearms, bullets, and shell casings was admitted into evidence.

Sergeant Dalton testified that six shell casings and one bullet found at the crime scene were fired from the Taurus pistol recovered from the Defendant's home. He further explained that there were three other bullets that he identified as not being fired from the Taurus pistol, which indicated there was a second firearm used at the scene. Sergeant Dalton testified that there were no shell casings or projectiles that appeared to be fired from the AR-15 rifle recovered from the scene.

KPD Officer Michael Carter testified that he was dispatched to the University of Tennessee Medical Center to take photographs of three gunshot victims in the emergency room. He was shown photos of Stevens, Woods, and Rasheed, all of which were admitted into evidence and published to the jury.

Dr. William Russell Oliver, an assistant medical examiner employed by Knox County, conducted the autopsy on Stevens on January 29, 2018. He explained that there were three gunshot wounds on her body, one to "the right chest that exited through the left back, one to the left abdomen that exited through the right lower back, and one through the right arm." In his final report, Dr. Oliver concluded the cause of death was "multiple gunshot wounds" and the manner of death was "homicide." The final report was admitted into evidence.

Based on the above proof, the jury convicted the Defendant as charged of first-degree felony murder of Stevens (count one); the lesser included offense of second degree murder of Stevens (count two) (merged into count one); the lesser included offense of attempted second degree murder of Woods and Rasheed (counts three and four); as charged of especially aggravated robbery of Stevens and Woods (counts five and seven); and the lesser included offense of aggravated assault of Rasheed (count six). The trial court merged count two into count one and sentenced the Defendant to life imprisonment. Following a sentencing hearing, the trial court imposed a sentence of twelve years in counts three and four, a sentence of twenty years in counts five and seven, and a sentence of six years in count six. The trial court imposed concurrent terms of twelve and six years for counts three, four, and six and concurrent terms of twenty years for counts five and seven, to be served concurrently to count one. The twelve-year concurrent term for counts three, four, and six was ordered to be served consecutively to count one, for an effective sentence of life plus twelve years.

The Defendant filed a timely motion for a new trial, which was denied following a hearing. The Defendant filed a timely notice of appeal, and this case is now properly before this court for review.

## ANALYSIS

On appeal, the Defendant argues that the evidence was insufficient to support his convictions for first-degree felony murder, attempted second degree murder, and especially aggravated robbery. The State contends, and we agree, that the evidence was sufficient to support the convictions.

**Sufficiency of the Evidence.** "Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)). "Appellate courts evaluating the sufficiency of the convicting evidence must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see Tenn. R. App. P. 13(e). When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005); Hall, 976 S.W.2d at 140. The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting Hanson, 279 S.W.3d at 275). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence, and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." Wagner, 382 S.W.3d at 297 (citing State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997)).

**A. Felony Murder and Especially Aggravated Robbery.** The Defendant argues the evidence presented at trial was insufficient to support his convictions of first-degree felony murder because the State failed to establish the underlying felony of robbery. Citing State v. Crawford, 470 S.W.2d 610, 612 (Tenn. 1971), the Defendant argues the State's proof of intent to commit a robbery was based entirely on circumstantial evidence which did not "rise to the strength and cogency required to instill confidence in the jury's verdict of guilt." Given the witness testimony and the forensic evidence, the State argues there was sufficient evidence to support the Defendant's convictions. We agree with the State.

As charged in this case, first-degree felony murder is the "killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery[.]" Tenn. Code Ann. § 39-13-202(a)(2). Robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a). "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." Tenn. Code Ann. § 39-14-103(a). Especially aggravated robbery is robbery "accomplished with a deadly weapon and where the victim suffers serious bodily injury." Tenn. Code Ann. § 39-13-403(a). "Deadly weapon" is defined as "[a] firearm or anything manifestly designed, made or adapted for the purpose of inflicting death or serious bodily injury." Tenn. Code Ann. § 39-11-106(6). "Serious bodily injury" includes any bodily injury that involves a substantial risk of death, extreme physical pain, protracted or obvious disfigurement, or protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty. Tenn. Code Ann. § 39-11-106(37).

- 10 -

To sustain a conviction for first-degree felony murder where the underlying offense is robbery, the intent to commit the robbery must exist prior to or concurrent with the death of the victim. See State v. Buggs, 995 S.W.2d 102, 107 (Tenn. 1999). The killing may precede, coincide with, or follow the felony and still be considered as occurring "in the perpetration of" the felony offense, so long as there is a connection in time, place, and continuity of action. Id. at 106. Proof that such intent to commit the underlying felony existed before, or concurrent with, the act of killing is a question of fact to be decided by the jury after consideration of all the facts and circumstances. Id. (citing Hall v. State, 490 S.W.2d 495, 496 (Tenn.1973)). "[A] jury may reasonably infer from a defendant's actions immediately after a killing that the defendant had the intent to commit the felony prior to, or concurrent with, the killing." Id. at 108.

The Defendant argues that the State failed to prove the Defendant's intent to commit a robbery prior to the shooting, that the evidence was entirely circumstantial, and that none of the State's witnesses were able to establish a prior plan to rob Woods. However, the Defendant cites Crawford for the proposition that a guilty verdict may result from purely circumstantial evidence only if the facts and circumstances of the offense were "so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the [appellant]." State v. Crawford, 470 S.W.2d at 612. Our supreme court rejected the Crawford standard, holding that "direct and circumstantial evidence should be treated the same when weighing the sufficiency of the evidence." Dorantes, 331 S.W.3d at 381. Accordingly, viewed in the light most favorable to the State, the evidence, direct and circumstantial, is more than sufficient evidence to establish the Defendant's intent to rob Woods.

The proof at trial showed that the Defendant arranged a meeting with Woods at Stevens's home to purchase marijuana. The Defendant and four of his friends, each armed with guns, drove to Stevens's home and split into groups upon arriving at Stevens's home. The Defendant and Wright approached Stevens's front door first, signaling for co-defendant Spears and Davis to follow them before they entered the house. Jones stayed in the driver's seat of the car. As the Defendant greeted Woods, Woods and Rasheed were alerted by Stevens that someone was walking up to the house with a gun. When Rasheed opened the door to see who was coming, co-defendant Spears opened fire on Rasheed with an AR-15 rifle covered by a bag. The Defendant and Wright then pulled out guns and shot Woods. After Woods had fallen to the ground, the Defendant and Wright joined co-defendant Spears in shooting through Stevens's closed bedroom door, and Stevens was fatally shot and Rasheed was seriously injured. The Defendant and his companions grabbed the marijuana, an AR-15 rifle, and a backpack containing $25,000 cash from the home as they fled the scene. The rifle belonged to Stevens and the backpack and cash belonged to Woods. Woods sustained gunshot wounds to his right clavicle and groin, which caused "extreme physical pain," and required surgery and weeks of healing.

Woods and Rasheed identified the Defendant as being at Stevens's house actively taking part in the shooting and robbery. Of the four men who were in the car with the Defendant prior to and after the shooting, Jones and Davis testified. Davis said that all of the men were armed when they drove to Stevens's house. Davis explained that the Defendant and co-defendant Spears approached the house initially, signaled for the other men to join them, but Davis retreated after he heard gunshots. Davis testified further that the Defendant handed him the AR-15 rifle before they drove away. Jones testified that when the Defendant returned to the car, he said "f[—]k with me, you know, I'll f[—]k around and get rich" as they drove away. When the men returned to Davis's home, they divided the marijuana stolen from Woods amongst them. Police recovered the AR-15 rifle from the Defendant's home along with a Taurus nine-millimeter handgun and shell casings similar to those recovered from the scene. Expert testimony established that the fingerprints found on the Taurus handgun matched the fingerprints of the Defendant and that the bullets recovered from the crime scene were fired from the Taurus handgun.

The Defendant also hinges his argument on Woods's testimony that when the shooting began the Defendant had a "blank look" on his face, and the phrase "like we didn't know what was going on." We interpret this phrase as characterizing whether Woods and Rasheed knew they were being robbed, not the Defendant. The Defendant fails to explain his active participation in the robbery after co-defendant Spears shot at Rasheed. The remainder of the Defendant's claims address the credibility of Jones and Davis, the testimonies of which he insists were conflicting and self-serving. However, it is well-settled that questions regarding the credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the jury as the trier of fact and may not be revisited on appeal. See Byrge, 575 S.W.2d at 295; Bland, 958 S.W.2d at 659. Based on the evidence presented at trial, a rational jury could conclude that the Defendant intended to rob Woods of his marijuana and money and Stevens of her firearm and that during the perpetration of the robbery the Defendant shot at them, causing serious injury to Woods and killing Stevens. See State v. Antonin Henderson & Marvin Dickerson, No. W2015-00151-CCA-R3-CD, 2016 WL 3390627 at *7 (Tenn. Crim. App. June 10, 2016) (evidence is sufficient to support aggravated robbery conviction when it shows that property was taken, the taking was accomplished with a deadly weapon, and the victim suffered serious bodily injury in connection with the taking). Moreover, there is clearly a connection in time, place, and continuity of action between the killing of Stevens and the taking of property, supporting an inference that Stevens was killed in the perpetration of the theft. See State v. Andre Harris, No. W2011-02440-CCA-R3-CD, 2013 WL 2424115, at *13 (Tenn. Crim. App. June 5, 2013) (citing Buggs, 995 S.W.2d at 106-07). The Defendant is not entitled to relief.

**B.** **Attempted Second Degree Murder.** The Defendant also contends the evidence was insufficient to support his convictions for attempted second degree murder against Woods and Rasheed because the State failed to show that he intended to kill anyone.

To establish that the Defendant attempted to commit second degree murder, the State had to show that the Defendant acted with the intent to cause a result that would constitute the offense of second degree murder, under the circumstances surrounding the conduct as the Defendant believed them to be, and that the conduct constituted a substantial step toward the commission of the offense. Tenn. Code Ann. § 39-12-101(a)(3). To constitute a substantial step, the Defendant's entire course of action had to be shown as corroborative of the intent to commit the offense. Tenn. Code Ann. § 39-12-101(b). Second degree murder is a knowing killing of another. Tenn. Code Ann. § 39-13-210(a)(1). A person acts intentionally "when it is the person's conscious objective or desire" to cause the result. Tenn. Code Ann § 39-11-302(a). A "person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b).

Viewed in the light most favorable to the State, the evidence presented at trial showed that the Defendant shot Woods at close range, "no more than two feet away from [him]," right after co-defendant Spears began firing multiple shots at Rasheed. Woods testified that the Defendant looked him in the eye as he shot him. Wright, who was accompanying the Defendant, then turned and shot Woods, knocking him onto his back. The Defendant, along with co-defendant Spears and Wright, then turned to the closed door of the bedroom where Rasheed had fled and began shooting through the door at Rasheed. In addition to Woods's and Rasheed's testimony identifying the Defendant as one of the shooters, the State presented forensic evidence connecting the Defendant to a handgun used during the shooting. While the Defendant challenges the expert testimony as speculative, the above evidence is more than sufficient evidence for a rational jury to conclude that the Defendant intended to commit a knowing killing of both Woods and Rasheed when he shot at them. See State v. Porter, No. 03C01-9606-CC-00238, 1997 WL 661419, at *3 (Tenn. Crim. App. Oct. 24, 1997) ("Proof that a person has deliberately aimed a pistol and shot several times at his intended victim is sufficient to support a conviction for attempted second-degree murder."). Accordingly, the evidence was sufficient to support the convictions of attempt to commit second degree murder.

## CONCLUSION

Based upon the foregoing authorities and reasoning, we affirm the judgments of the trial court.

- 13 -

_____
CAMILLE R. MCMULLEN, JUDGE